COUNTRY HEARTH, INC., T/A MARLEYBONE PUB, APPELLANT, v. OLD BRIDGE TOWNSHIP COUNCIL AND DIVISION OF ALCOHOLIC BEVERAGE CONTROL, STATE OF NEW JERSEY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1987—Decided November 30, 1987.

Before Judges BRODY and LONG.

*Brian J. Molloy* argued the cause for appellant (*Wilentz, Goldman & Spitzer,* attorneys; *Brian J. Molloy* and *Kenneth M. Denti,* on the brief).

*James P. Durek* argued the cause for respondent Township Council of the Township of Old Bridge (*Durek & Harth,* attorneys; *James P. Durek,* on the letter brief).

*W. Cary Edwards,* Attorney General of New Jersey, attorney for respondent Division of Alcoholic Beverage Control (*Lee Barry,* Deputy Attorney General, on statement in lieu of brief).

The opinion of the court was delivered by

BRODY, J.A.D.

Respondent Council of the Township of Old Bridge revoked appellant's plenary retail consumption liquor license on May 5, 1986, and denied appellant's application for its renewal. For ease of expression, we will refer to both sanctions simply as a revocation of the license. The Director of the Division of Alcoholic Beverage Control (the Director) sustained the revocation by neither modifying nor rejecting the Initial Decision of an Administrative Law Judge (ALJ) who also recommended revocation. *N.J.S.A.* 52:14B–10(c). We have stayed the revocation pending the outcome of this appeal.

The revocation is based upon the unlawful drug activities of appellant's former president and 60% shareholder, Thomas Sorrentino, before he was arrested in 1982 and convicted on February 11, 1986, of three drug crimes. Specifically the revocation rests upon violations of *N.J.S.A.* 33:1–25 and *N.J.A. C.* 13:2–23.5.[1] The statute, as relevant here, prohibits issuance of a license to a corporation if one or more of its stockholders owning more than 10% of its stock or one or more of its officers have been convicted of a crime involving moral turpitude; the regulation, as relevant here, prohibits a licensee from allowing, permitting or suffering on the licensed premises or any premises accessible from the licensed premises any unlawful posses-

---

[1]*N.J.S.A.* 33:1–25 provides in part:

> No license of any class shall be issued to any person under the age of 21 years or to any person who has been convicted of a crime involving moral turpitude.

> In applications by corporations, except for club licenses, the names and addresses of, and the amount of stock held by, all stockholders holding 1% or more of any of the stock thereof, and the names and addresses of all officers and of all members of the board of directors must be stated in the application, and if one or more of such officers or members of the board of directors or one or more of the owners, directly or indirectly, of more than 10% of such stock would fail to qualify as an individual applicant in all respects, no license of any class shall be granted.

*N.J.A.C.* 13:2–23.5 provides:

> (a) No licensee shall allow, permit or suffer in or upon the licensed premises the habitual presence of any known prostitute, gangster, racketeer, notorious criminal, or other person of ill repute.

> (b) No licensee shall allow, permit or suffer in or upon the licensed premises any unlawful possession of or any unlawful activity pertaining to narcotic or other drugs, or other controlled dangerous substances as defined by the New Jersey Controlled Dangerous Substances Act (N.J.S.A. 24:21–1 et seq.) or any prescription legend drug, in any form, which is not a narcotic, depressant or stimulant drug, or controlled dangerous substance as so defined.

> (c) No licensee shall allow, permit or suffer the licensed premises to be accessible to any premises upon which any illegal activity or enterprise is carried on, or the licensed premises or business to be used in furtherance or aid of or accessible to any illegal activity or enterprise.

sion of drugs, unlawful drug activities or any other unlawful activities.

Thomas Sorrentino had transferred his shares in appellant to his wife Joie on January 4, 1986, a month before his conviction. She thereby became owner of all the shares. Although Joie Sorrentino had previously owned 40% of the shares, she had never participated in operating the business. Thereafter, as appellant's president, Joie took over management of the business. By the time that the Council revoked the license in May 1986, Thomas was no longer a stockholder or officer of appellant, and none of its stockholders or officers had been convicted of a disqualifying crime. The revocation was therefore erroneously based upon *N.J.S.A.* 33:1-25. *See Trap Rock Industries v. Sagner,* 133 *N.J.Super.* 99 (App.Div.1975), aff'd 69 *N.J.* 599 (1976) and *In re Boardwalk Regency Corp. Casino License,* 90 *N.J.* 361 (1982), app. dism. 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.*2d 927 (1982).

It is not claimed that Joie Sorrentino is fronting for her husband who is now serving federal and state prison terms. Before Thomas was arrested in 1982, Joie had no knowledge of his criminal activities. She had already commenced a suit against him for divorce and was demanding that he transfer his shares of appellant's stock to her. After his arrest, Thomas persuaded Joie to withdraw the suit and her demands until after he pled guilty because the police wanted him to continue his criminal activities undercover before tendering his plea.

Thomas pled guilty to the drug crimes in October 1985 and when sentenced was given consideration for his cooperation with the police. Just before he was sentenced, Thomas transferred his shares to Joie and she reinstated her divorce suit. After acquiring her husband's stock, Joie immediately changed the name of the bar and fired all of appellant's employees. Thereafter she has successfully operated the business. These uncontroverted facts distinguish this case from *Florence Methodist Church v. Tp. Committee, Florence Tp.,* 38 *N.J.Super.*

85 (App.Div.1955) and *Niglio v. New Jersey Racing Commission,* 158 *N.J.Super.* 182 (App.Div.1978), where we were satisfied that wives were fronting for their disqualified husbands.

The violation of the regulation stands on a different footing from the violation of the statute. Violation of the statute requires purging a licensee of the influence of a person who in his private life has committed a serious crime and therefore presents a risk that he will influence the licensee to violate one or more of the strict regulations that govern the operations of a licensed premises. Violation of an operational regulation requires punishing the licensee even though the punishment may hurt innocent people who had invested in the license. *Valdivia's Bar, Inc. v. City of Elizabeth,* 6 *N.J.A.R.* 161, 165 (1981). Put another way, disciplinary proceedings against a corporate licensee are proceedings *in rem,* and not *in personam* against its stockholders. *See Senen Medina v. City Council of City of Trenton,* ABC Bulletin No. 2301, Item No. 3 (Aug. 1, 1978).

It is therefore important to distinguish between criminal activities of a stockholder or officer of a licensee that did not occur on the licensed premises and criminal activities on the licensed premises that were committed or permitted by the licensee. Where the same criminal activities would both disqualify the individual and, if conducted on the licensed premises, violate a regulation governing the licensee's operation of the licensed premises, the trier of fact must specifically determine whether any of the activities occurred on the licensed premises before it can punish the licensee. Also, where there has been a violation of a regulation the distinction requires the licensing authority to focus its attention on the seriousness of the criminal activities occurring on the licensed premises in determining the severity of the penalty.

At the hearing before the ALJ, appellant defended the charge of violating the regulation by arguing that all drug activities occurred off the licensed premises. The licensed premises are

the "[f]irst floor and cellar of frame 2–story dwelling." Appellant claims that the only drug activities in the building occurred in Thomas's accounting offices on the second floor. The second-floor offices are outside the licensed premises and accessible only from the street. The ALJ, however, found that "at the very least, telephone calls concerning [Thomas] Sorrentino's narcotics activities were made to and from the licensed premises in addition to being made to and from the second floor offices."

That finding is supported by the testimony of Sergeant Dennis Crowley who, before Thomas was arrested, had monitored court-authorized interceptions of conversations on telephones located in three premises: the licensed premises, Thomas's second-floor offices and a nearby townhouse where he apparently lived on occasion with one of appellant's female employees.

Crowley testified about a telephone call to the bar that originated in Pennsylvania and was placed by a man named "Uncle Bill" who asked for "Tommy." Thomas got on the line and told the caller, "Let me go to a safe phone." Thomas then returned Uncle Bill's call from a telephone in his second-floor offices and discussed with him the price of drugs.

Crowley also testified that he overheard a conversation between Thomas and an employee of appellant named Jeanie who had placed the call to Thomas from a telephone in the bar. The witness described the conversation as follows:

> She said the people from Philly were here with the stuff. Tommy told her that they had come early. They weren't supposed to be there until later, for her to take them out, and entertain them until he could either call or meet them at the location, where he would either call or meet them at Lilly Langtree's on Route 9 where he instructed her to take them and entertain them.

Crowley further testified:

> Really there were other co-defendants [of Thomas's] that used the phone downstairs to call various people or other co-defendants eventually trying to get money, arranging the transactions of more drugs, conversations [as] to whether or not the drugs—the batch was a good batch or the stuff was as good as the

last stuff, collections of money and people from the outside were always calling in the bar looking for some of these defendants and Tommy.

In his opinion the ALJ properly recognized the "wide discretion" of the local issuing authority in determining the penalty. Although we do not have a transcript of the proceedings before the Township Council, the resolution it adopted recites that it had considered the judgment of conviction and order for Thomas's commitment in the criminal case, and had considered search warrants and search warrant returns for the licensed premises, Thomas's second-floor offices and the townhouse. The resolution also recites that the Council had considered letters to the sentencing judge concerning Thomas's cooperation written by an Assistant United States Attorney and an Assistant Attorney General.

The Council made the following findings based upon that evidence:

1. ... Thomas Sorrentino, President and principal stockholder of the licensee ... pleaded guilty to conspiracy to (a) possess a controlled dangerous substance (C.D.S.), possession of C.D.S. with intent to distribute and distribution of C.D.S.; (b) two counts of possession of C.D.S. Judgment of conviction recites conspiracy charge and possession charges focused upon, among other places, the licensed premises, where C.D.S. was ultimately seized during a raid.

2. Search Warrants and returns for both licensed premises and premises where President and principal stockholder resided, where C.D.S. was seized.

3. Letters submitted by defendant dated December 4, 1985 [from the Assistant United States Attorney and the Assistant Attorney General] ... clearly indicated distribution of C.D.S. in conspiracy for distribution of C.D.S. both by Mr. Sorrentino and other persons occurring at the licensed premises between late 1979 and the Spring of 1982; ...

The Council imposed the revocation for the following stated reasons:

1. Violation of *N.J.A.C.* 13:2–23.5 inasmuch as serious narcotic and illegal activities occurred at the licensed premises between late 1979 and the Spring of 1982;

2. Violation of *N.J.S.A.* 33:1–25 inasmuch as the individual who was President and principal stockholder of the licensee, at all relevant times, was convicted of a crime rising to the level of moral turpitude on February 11, 1986.

■ The attorney who represented Thomas Sorrentino in the criminal proceedings also represented appellant before the Township Council. At the criminal proceedings, however, it

was not significant whether Thomas's drug activities occurred in the bar or in his offices on the second floor. That distinction was not drawn in those proceedings where the licensed premises and the second-floor offices were both referred to as "the licensed premises." The Council therefore did not know that it was relying on documents in which references to sale and possession of drugs on "the licensed premises" related to activities that occurred outside the licensed premises.

. It was not until the hearing before the ALJ, when appellant had different counsel, that the testimony of witnesses revealed that there was comparatively little drug activity on the licensed premises, and that the residence where drugs were found was not Thomas's home, but the townhouse where, without his wife's knowledge, he was living with one of appellant's employees. Thus the Council had a wrong impression of the extent of drug activities on the licensed premises and may also have had a wrong impression about Joie's knowledge of her husband's drug activities. Joie testified before the ALJ but not before the Council.

The Council's resolution is also defective because the revocation was based in part on Thomas's conviction. For the reasons we have previously stated, revocation of the license was not available as a sanction for Thomas's conviction after he had severed his ties with appellant. We cannot tell whether the Council would have softened the penalty had it known that it could not be based upon Thomas's prior disqualification as a shareholder and officer.

In view of these defects in the action taken by the Council, it was not appropriate in this case for the ALJ to have deferred to the Council's judgment. Based on the evidence before it, the Council was given the wrong impression of the amount of drug activities on the licensed premises and probably did not know that Joie was neither involved in nor aware of those activities. The Director must therefore reconsider the penalty. He is free, of course, to remand the matter to the Council for it to

reconsider the penalty in light of the views expressed herein and in light of the additional evidence that was presented before the ALJ.

Reversed and remanded for further proceedings consistent with this opinion. Our stay is continued until there is a new final determination below.